The next matter, No. 25-1230, in Re, CVS Health Corporation, Securities Act Litigation. At this time, would counsel for the appellant please come to the podium and introduce himself on the record to begin. Good morning. My name is John Rizzio-Hamilton from Bernstein, Litowitz, Berger & Grossman for the lead plaintiff appellant. With the court's permission, I'd like to reserve three minutes for rebuttal. You may. Thank you very much. The principal error below was that the district court failed to properly analyze and sustain lead plaintiff's claim for omissions under Item 303 of Regulation SK, both with respect to the business losses that the long-term care unit suffered by the time the registration statement became effective, as well as to the undisclosed rollover practices. Significantly, the district court never really engaged with the Item 303 disclosure standards, which do not require any misleading statement and are significantly broader than the disclosure obligations under Section 10b of the Exchange Act. Nor did the district court analyze the elements of an Item 303 claim. Item 303 required the court to analyze whether this complaint pled three things under Rule 8 with respect to the Item 303 claim. The first is whether the complaint alleged a trend or uncertainty with respect to either the issue of business loss or the rollovers. The second is whether the complaint alleged that these trends or uncertainties were known to management at the time the registration statement became effective in February of 2018. And the third is whether it was reasonably likely that these trends or uncertainties would have a material impact on the company's performance. The district court simply never analyzed these issues at all, much less under Rule 8. Okay, but it does seem like they were on the losses. Let's start with the losses. Sure. They were identifying a downward trend. It was 7%. It's now maybe 1%. There's client retention issues. There's bed loss issues. We have some hopes, but there's very much a real possibility of further write-downs, and that's certainly not suggesting a positive trend. It's suggesting either our best cases may be neutral but may be bad. So that disclosure is not suggesting a positive trend, but it's still inadequate for the purposes of Item 303. So first of all, and I think there's maybe three or four critical aspects of this disclosure that I'd like to discuss. The first is that the disclosure asserts that the Omnicare unit has retained the full goodwill value as of the time the registration statement became effective. That's number one. Number two, it asserts that the company is actually projecting future script growth. And number three, it does say that if we don't hit these growth targets, it could be impaired. That is inadequate because at the time that disclosure was made, the complaint alleges that the Omnicare unit as a whole had lost between 25% to 33% of the business since the time it was acquired, and that its business already was impaired and that such impairment would continue into the future. As I understand it, there was a disclosure in the 2017 10-K that cash flow projections declined from the prior year, due in part to several factors, including client retention rates. That's correct. So I'm correct. That is a disclosure of a trend, albeit it doesn't quantify or give a sense of the magnitude of the trend. So that's a fair point, and the last portion of your observation is critically important for the purposes of Item 303, because Item 303 does require the issuer to identify the extent and impact of the trend. Could you focus on the specific language in 303 that would require more than a disclosure of the trend, but a quantification or some sense of its size? Yes, Your Honor. So Item 303 mandates disclosure of any known trend or uncertainty and the manner in which it might reasonably be expected to have a material impact on future revenues, and that's how this Court described it in Silverstrand at page 106 of the decision. To be perhaps nitpicking, perhaps not, but manner is different than extent. It doesn't say the extent to which it will have an impact. It says the manner in which it will have an impact. Well, you know, courts have interpreted this provision as actually requiring the extent to which, pursuant to that manner prong, and multiple courts have done this. The SOTA Court out of the Ninth Circuit very recently did this. The Second Circuit, whose decisions this Court cited favorably in Silverstrand, said this quite clearly in both the Panther Partners decision as well as the Litwin v. Blackstone decision. So as the Ninth Circuit recently put it in the SOTA case, just identifying a trend would be of little use without assessing the extent of the impact of the trend, and that's really the kind of information that Section 11 and Item 303 require to be disclosed, quite separate and apart from whether a given statement is misleading. So as I understand your theory with respect to the LTC unit, it boils down to saying we allege, and therefore you should assume, there was a 25 to 33 percent loss of business in that unit, and that significant trend was not disclosed. At most it was said there was some loss of business, but there was a failure to provide a magnitude, and 33 percent is a heck of a lot bigger than some. I think that's a significant part of it, Your Honor. Is there anything else? Is that the full logic of your claim except as applied to the rollover issue? Before we get to the rollover issue, the other significant piece of the business loss issue is that the trend was accelerating. The complaint is really kind of rife with allegations that throughout 2017, and particularly from the mid to latter part of the 2017 year, the business loss in the Omnicare unit was really picking up speed, and the employees give qualitative support to the 25 to 33 percent figure by saying they were losing business hand over foot, there was an impending sense of doom, it felt like the bottom was falling out of the ship. And that's an important moment in time, because that's the time leading right into the effectiveness of the registration statement in February 2018. So it's the existence of the trend, the fact that it had already occurred to a material degree, and had a very significant impact on the business. So what do we make of the fact that they say simultaneously we're doing other things that we think might offset this? And so does that, you know, I know there's some suggestion that some of those had already been unsuccessful, so I understand that point, but I presume they were still trying to do things to save the ship. So at what point do they have to say we have no chance of saving the ship, here's the data on our losses? So item 303 tells us that when it's reasonably likely that there's going to be an impact, that disclosure is triggered. And we respectfully submit that the allegations in the complaint, including the loss of 25 to 33 percent, the acceleration through 2017, and the other reports from the former employees, demonstrate that it was reasonably likely at that point. And this is actually another point of law that was unaddressed below, but the Carvelli case out of the 11th Circuit, fairly recent item 303 discussion, says that even in the event that management can't determine the reasonably likelihood standard is met, it must nonetheless disclose unless it determines affirmatively that there's no reasonable likelihood of an impact. And given all the facts that we allege under Rule 8, I don't think there's any fair inference against us as a matter of law to dismiss the case that such a determination could be made, that there was no reasonable likelihood of an impact. And this actually, if it's okay with you, provides an opportune segue to the rollover issue. Before you go to the rollover, let me just take you back a little bit more in depth into the quantification or magnitude issue. I anticipate from the briefs that a counter to what you have just said is that there was, that they did disclose that the impairment test for goodwill went from a 7% exceedance to a 1% exceedance. So there's some quantification of something. Is that sufficient? No, not on these facts. And the reason being that we allege, that disclosure asserts that the goodwill is still unimpaired. It says we're still 1%. Is that a magic number? I mean, you're still as Aetna shareholder who's thinking, let me value my Aetna share versus my CVS share. Right. I thought about it at 7%. I had one thought. Now I'm thinking about it at 1%. I have a different thought. It may move into negative. That's not good either. But I'm already having a downgraded thought because we've moved from 7 to 1, correct? That much is true as far as it goes. But it doesn't go far enough on these facts because the allegation of paragraph 114, and it's quite specific, is that the Omnicare unit as a whole had lost between 25 to one-third of its entire business. That is at odds with the notion that its goodwill value was unimpaired. It simply is. It strains. Except for them saying we might still save the day. And they do say we might still save the day. And that, frankly, their statement in the disclosure at issue that they're assuming future script growth, right, actually mitigates what one would take from the downward trend. And that's an important fact to consider with respect to this disclosure. It wasn't all negative. Maybe that's false. But they're telling you, what they're saying is it's been down. There's client retention problems. There's bed loss problems. We have a plan that's going to increase script growth, we think. But if it doesn't, we're probably going to have more write-downs. That's what they said. They're saying that's not enough to tell you, to give you a full flavor, because the reality was there had been a quantifiable already collapse. And I assume they're going to say, but that wasn't final and definite. We thought still we were going to save the day with these other business plans. Well, it was final and definite. It was reported internally in state-of-the-company conference calls and e-mails and spreadsheets, as the complaint pleads, in great detail. And management's intent and subjective belief is wholly irrelevant in a Section 11 case. This is not like firefighters, you know, where Scienter mattered. It's simply off the table here. I see my time is expiring, and I do want to address the rollover issue, however briefly, and I'm happy to be as brief as you'd like. I think the contrast between this disclosure we've been discussing and the disclosure at issue with respect to the rollovers speaks volumes. The rollover disclosure is – may I complete my thought? I want to hear about this. Thank you. The rollover disclosure is some incredibly vague and generic statement that they had received a CID, a civil investigative demand from the government. And that could be anything, right? That could have gone to a third party, and they could be a third party in something. I mean, it doesn't really – am I right about that? It's completely uninformative. It doesn't tell you any of the critical information that Item 303 requires. It doesn't tell you whether this rollover behavior actually was occurring. That's big picture point one. Getting a demand from the government doesn't mean you're doing anything wrong. So it doesn't even tell you that the behavior was occurring. Number two, it most certainly does not even indicate the scope of the behavior, which the complaint alleges in significant detail was widespread, existing across 3,200 facilities for a period of eight years, leading right up to the effectiveness of the registration statement, and in paragraphs 219 to 220, quantified as encapsulating hundreds of millions of dollars a year. But I understood your reply brief to say, because in response to the we don't have to admit we did bad things, was maybe not, but you also stopped these practices, which is going to lead to a loss of revenue. And maybe you don't have to admit they're wrong, but if you're going to make a business change, which is stopping this practice, that's going to lead to a downward revenue, you have to say that. Is that true? Judge Afram, that is absolutely dead on the money. That is the actual principal basis that the complaint alleges for the disclosure obligation under Item 303 with respect to the rollovers. It does then go further and say, by the way, this conduct also triggered a civil and sanctions liability that you also should have disclosed. But that is separate, and it's a critically clarifying point that you just made about the basis for the Item 303 disclosure with respect to the rollovers. And the sanctions, by the way, were far from theoretical, and there's no way a company could legitimately determine, based on the facts alleged in the complaint, that there was no reasonable likelihood of sanctions. I look at the USB case, which they talk about. Yeah. And in that case, I guess I saw it differently. I think it favors you, but I just want to make sure you're getting at your point, which is there they said, there's an investigation. This is what it's about. They don't go and say we did it, and maybe they don't have to say they did it. But are you saying that the difference is we, because they didn't even really refer to rollover practices, we had no way to aggregate or estimate or understand even what the magnitude of this potential problem is, which distinguishes it from UBS? That's exactly the point. And I think that the key case to look at with respect to the UBS series here is Judge Sullivan's district court decision. At the time, he was a district court judge in the SDNY, later joined the circuit. But his decision below quotes the disclosures at issue in that UBS case, and they're extraordinary. They say here's the investigation. Here's what it's about. By the way, here's the people who have been detained as material witnesses. Here's the people who have been arrested. And they say they give the years at issue. I mean, they give a fully robust disclosure, the type of which is completely absent here in this case. And last, Your Honors, the trigger that the district courts seem to apply that controls the Item 303 analysis with respect to the rollovers, namely whether sanctions are being imposed or imminent, which is the district court language, is completely absent from Item 303 and erects kind of like a false cornerstone of the disclosure obligation that simply doesn't exist. So are you saying with the narrower claim or the broader claim, are you saying that if management is aware of illegal activity at the company that could result in material liability, it must disclose it under 303? No, because I don't have to go that far here for the factual point that Judge Aframe raised, which is that we have a case here where management identified potentially problematic activity, potentially improper, and decided to stop it, and that it was the cessation of these practices that would have a material negative impact on the company. That's point one, and it's totally independent of point two, which is that, in addition, there was potentially further liability civilly and by treble damages and sanctions that this conduct also triggered, which, by the way, was far from hypothetical. A jury just returned a verdict against Omnicare that led to a billion-dollar verdict and bankrupted Omnicare for the behavior that is pled in the complaint. But your complaint about that is to just say there's a CID that generally relates to our prescription filling or something like that? Cycle fill process, which I don't even know what that means. Okay, cycle fill process. Right. That's basically nothing. That doesn't give any flavor of what's going on. You don't know if they're the target. You don't know if it's their conduct, a third party's conduct. You just don't know anything. You just don't know anything about the conduct, its severity, its magnitude, scope, and potential impact, and, therefore, that disclosure is next to worthless. And one last question, back to, there are further, the first big write-down or another big write-down happens between the approval of the deal and the closing of the deal? Yeah, that's correct. Do you say none of that matters? That's irrelevant to the analysis? So it is irrelevant to the analysis under both Section 11, which is the principal claim at issue, and Section 14, which I'll acknowledge is a secondary claim. It's irrelevant under Section 11 because the law and the statute itself is crystal clear that the accuracy and completeness of the registration statement is judged only as to one moment in time, which is when it becomes effective. Under Section 14, the shareholder vote is the key and only moment in time at which the accuracy and completeness of the disclosures are measured. And in all events, both of the write-downs at issue came after both the date the registration statement became effective in February 2018 and the date of the shareholder vote in March of 2018. Thank you, Counsel. Thank you, Your Honors. Thank you, Counsel. At this time, would Counsel for the Appellees please introduce themselves on the record to begin? Good morning, Your Honors. Amanda MacDonald from Williams & Connolly on behalf of the Appellees. Your Honors, the District Court conducted a thorough review of the allegations in this complaint, and it properly applied the law of this circuit and correctly concluded that these claims are not actionable under the securities laws. And that is why each and every one of the prior cases, this is the fourth, have been dismissed in every jurisdiction. That includes claims of rollovers. That includes claims of customer losses up to 25%. Plaintiff is challenging the- I can't say that I studied all of them. I mean, first of all, I studied that New York one that really didn't say much of anything. And then I read our case quite closely. And what our case seemed to be saying is this is over a long period of time, and there were losses, but you have to attach the loss to the particular statement, and maybe at that moment it wasn't known. But I guess what I saw different here is they are saying in the year leading up to the registration statement, this cataclysmic thing happened, and they didn't say it. And I viewed that as different. I mean, I understood this. At least our City of Miami case, or Miami case, I saw it to be different. Am I wrong about that? Let me respond to that. So this court in the firefighters case had to evaluate the very same disclosures based on the very same time frame because, of course, as you know, the securities laws evaluate the truth or falsity of a statement based on when it was made. The 2710K, which was issued in February of 2018, that is the moment that we are talking about in this case here today, that was at issue in firefighters. And the court applied the allegations in that case, what was going on in 2017, and critically, what was that material change in disclosure that also happened in the third quarter of 2017 that is directly consistent with exactly what the plaintiffs alleged? And I submit the same is true here. We have here an allegation that there was a 25 to 33 percent loss of customers at the time prior to the registration statement. We didn't have that sort of chronology in City of Miami. Let me clarify. Paragraph 114, which is where that allegation is laid out, actually doesn't say that. What it says, Your Honor, is that Omnicare had lost 25 to 33 percent of its business sometime in the, quote, 2016 to 2017 time frame. So, no, this is not a situation where, I think as might be suggested by that allegation, that it is suddenly on the precipice of the registration statement becoming effective. There has been a precipitous decline. Rather, when you read the allegations, and that one included, what you see is there is an allegation of 25 percent of customer loss that has taken place over the course of some two-year window. And during that two-year window, CVS disclosed to its investors that it was losing customers in the business and that it had come within one percent of impairment. So CVS's disclosures at that time throughout that very window where that 25 percent allegation is tied to, there are substantive disclosures that are being made on the market. Now you're on to a different issue because it was the lack of any timing connection between the business information alleged in the complaint in Miami and the statements being made. Here it seems we have the chronology, and you're now arguing that there was disclosure. I'm not sure I understand. The chronology, I submit, is quite similar to as it was before. Are you saying what they said here today are the way their brief overstates what they alleged? Yes. That their allegation remains gauzy because maybe at one moment it was 25 percent, but maybe we were doing better, and so it didn't remain 25 percent. Is that what you're trying to say? Exactly. It suffers from the same flaws as in firefighters where there was a two-year window during which it does not account for 25 percent of the business has gone down since when? Since 2014? Since the prior quarter? We don't know. There's also the net issue, which I think counsel discussed below but not today. Both this court and the other court have discussed the fact that you can't discern from the plaintiff's allegations, is that net losses? Again, I think the issue there is that plaintiff's own allegations say during this exact same timeframe, CVS is acquiring new long-term care facilities. And so as they're doing it and as you go through the allegations, you'll see, for example, there's one where someone says, oh, there was this meeting in November of 2016 where things were really bad. The same witness goes on to say, so we changed a bunch of stuff after that, and then we were gaining beds, 10,000 to 13,000 beds a year. So there's this issue of what is the 25 percent? Is it net? Is it whole? When did it happen? Is it, in fact, a continuation of a trend that CVS has disclosed to investors and that they are aware of? I will also note that the exact same allegation was present in the New York State case, 25 percent of the business. And so I do think that the lack of any time specificity is material here, and it is because the steady decline, which is a word that the plaintiff, one of the confidential witnesses uses, the steady loss of customers over the course of a two-year period is entirely consistent with CVS's disclosures at the time. CVS is not required to take an overly gloomy view. They are not required to say, we're trying to right the ship, as your Honor said, but we probably aren't going to be able to do it. They are permitted to do that. And I think there's no allegation that suggests, for example, that the senior living initiative that they referenced didn't happen. There's no allegation that the cost-cutting measures that CVS referenced weren't happening. Does the difference, firefighters, if I remember correctly, or city, Miami, as I refer to it, was a 10B-5 case. We've got a Section 11 claim here. Does that make a difference in how we read the complaint? It does not make a difference here, your Honor. And this is something that the district court took on as well. The pleading standard concept is a red herring, and that is because, as the court explained below, that neither this court's decision on firefighters nor its own turned on an allegation of fraud or the consequence of any heightened pleading standard. So the falsity, omission. Her being Judge McElroy's point is that this is not an omission case because they talked about the topic. And so, therefore, it's an omission case. It's a misleading case. And so then we have to decide, you know, do we have enough here to say that what CVS said is misleading? And we don't because we don't have enough chronology. I think she said both, your Honor. The plaintiffs present the exact same omission theory that was at issue in firefighters and before this court. It is, quote, the omission of client loss information throughout 2016 and much of 2017 was so fundamental that CVS's financial statements were misleading. That was the issue in firefighters. That is the exact same issue that is before your Honors today. There is the corollary issue of the pure omission concept under Reg SK, which I'm happy to talk about. But, yes, as to customer losses, it is the exact same theory because, as your Honors pointed out moments ago, CVS did disclose that it was losing customers. So this is not a nondisclosure case. This is a case where the disclosure was made and ultimately the allegation is that it was somehow misleading into lulling investors into thinking everything was hunky-dory when, in fact, it wasn't. Well, the disclosure, what about the quantification of the trend that was disclosed? Yes, your Honor. Thank you. So as to Regulation SK, which is where that concept comes up, I do want to note, I heard counsel say at the outset that this is their primary theory of liability. It has never been their primary theory of liability until appeal. It was, in fact, three pages of argument in their 72-page brief below. So faulting the court for not getting too far into it, I think, is unfair. But as to your question, your Honor, the quantification of the losses, what you see in that Q3 2017 disclosure, which, again, is exactly when the plaintiffs are alleging this substantial drop was occurring, the Goodwill disclosure quantified the drop from 7% to 1%, as you all pointed out. But I don't think what you guys got to during the first presentation was that the conclusion of the disclosure tells investors exactly what CVS thinks is possible of how this might affect the business. It says, if we do not meet our current forecasts, it is reasonably possible that the operational performance of the long-term care reporting unit could be below our current expectations in the near term, and the reporting unit could be deemed to be impaired by a material amount. There is no world where they are supposed to have to predict how much it will be impaired, when it's going to be repaired. There is a wall of case law in the Goodwill context. That sounds quite generic, and I'm not talking about prediction. I'm talking about the disclosure of a 25% to 33% loss of customers. And I'm not quite seeing – I see how there was a client retention issue that was disclosed. But if it has to have been quantified, at least to the extent of material, I don't see how anything you've just said about future forecasts quantifies what the actual historical loss is. The argument is that CVS Health, the issuer, is required to quantify the number of customer losses it is experiencing in its smallest business unit under Reg SK. That is an absolute non-existent case that I am aware of. That's not quite the argument. The argument is, if management is aware of a 25% to 33% loss of customers in a two-year period in a subdivision of the company that's worth $6 billion, why wouldn't management have to disclose that under 303? Well, because, again, Item 303 is about whether there is a known uncertainty that is reasonably likely to materially impact the financial performance of the issuer. In 2017, in the 10-K that's in the record, CVS Health reported revenues of $184 billion. So the notion that the loss of 25% of customers in its smallest business unit is so material that not only do you have to disclose customer losses, which, of course, were all in agreement were disclosed, but you have to quantify it, it just doesn't add up. And I don't see any allegation to suggest that somehow that loss would, in fact, become material to a company that has $184 billion in revenue. So if you have a $184 billion company, you could have a subsidiary or a subdivision of the company worth $10 billion that is instantly wiped out and doesn't even exist anymore, and you don't have to disclose that? Well, it might be material for other reasons, in which case you're back outside of the land of Reg SK and into the land of securities disclosures. But Reg SK is very specific in what needs to be disclosed, and it is whether there is a reasonably likely material financial impact to the issuer. And I noticed in the papers there were multiple times where opposing counsel put in there, well, the LTC unit was likely to be materially impacted. That is not the standard for Reg SK. It has to be to CVS Health company-wide. I have two minutes left. I do want to get to the rollovers, so I'm inclined to move there, unless your honors have more questions on customer losses. So on the rollover allegations, again, this has taken new life on appeal. There is a reason it has never been the primary theory of liability, and that is because it bears no relationship to the February 2019 goodwill write-down that underpins this lawsuit. I want to make this very clear because it sounded relevant to the questioning earlier. The QTAM, that is the ultimate result that came out of the subpoena, it was unsealed at the time of that write-down. It was unsealed at the time of the registration statement. Let me make that very clear. It was sealed, which means that CVS was not aware of it. This idea that it didn't disclose what rollovers? That's not what we're talking about with him. We were talking about that the CID itself was very vague. One wouldn't understand at all what was under investigation. That was point one. And point two was it led to a change in business practices of CVS. Aside from being legal or illegal, it led to a loss of money. Those were the two primary points. Yes, and let me respond to each. The idea that the CID disclosure wasn't very detailed, that is what was known at the time. A CID had been delivered to the company. This idea that it didn't use the word rollover, those are in allegations that were by confidential witnesses in a complaint that had never been disclosed to the company. It had no ability to use the word rollovers because there's no allegation that it was aware of that concept. If you look at the case law, and I'll talk about the UBS case if you'd like, there is no requirement that an issuer get a subpoena and predict and disclose at length, here's what we think their theory might be. We don't know if there's a key tam or not. Here are the things that we are talking about. What did they tell you in the CID? Just give us each records? I mean, I didn't work on that particular CID, but having done a few, it is a document. It's a series of document requests. And as you can tell from the disclosure, the CVS is responding with documents and information. And critically, you'll see that when that complaint becomes unsealed, when CVS sees it for the first time, there is a fulsome disclosure about it in their next filing. So the idea that CVS would somehow be faulted or need to predict where that CID is going to take them, it is belied by the securities laws. That is not what they're required to do. Now, on the second point, the idea of, okay, forget that. Let's focus on the concept that correcting it is going to have a material impact. Now, I want to be very clear about this. That is a theory that has never been articulated by this party. It has come up for the first time on appeal. It has come up for the first time on reply on appeal, which is this argument, if I may just continue to close out the point, that correcting the at-issue prescriptions of the rollovers would have a material impact on future revenue. So 75 pages of briefing below, we've never heard that. 53-page opening brief, we did not hear that. The theory is both wrong, unsupported in the complaint, and completely implausible. So it assumes, without any factual support, that every single prescription in every single assisted living facility was wrongful and would need to be renewed. And indeed, plaintiff says that in reply at page 11. They say that the rollovers, quote, impacted nearly 25% of the prescription volume. That is absurd. To their credit, that's actually not what is alleged. What is alleged is that assisted living facilities represent 24% of the prescription volume. Not that all of those prescriptions were improper. And the proof, again, from the complaint, that there is no correlation between the correction of these activities and a material impact to CVS health, is that by their own allegations at paragraphs 207 and 195, it was already fixed in more than half of the pharmacies by 2016. And there's no allegation and there's no facts to support any material adverse effect, even on the long-term care business, let alone CVS health, based on that correction. And the thing I'll note, the reason it's implausible is because, ultimately, it would mean that when someone who is living in an assisted living facility is on refills for their cholesterol medication and the refill expires, the implication would be that that prescription goes away in the new corrected world. Of course, the answer is that that person is not going to stop taking their cholesterol medicine. They're going to go and they're going to get a new prescription. So the idea, it is not pled, it is not supported, it has not been argued before, but it's also completely implausible to suggest that by virtue of correcting this rollover issue in the computer systems, that that is somehow going to materially affect not only the long-term care business, but certainly CVS health with its $184 billion in revenue. With that, I know I'm over time. So if your honors have any further questions, otherwise I'll take a seat. Thank you. Thank you, counsel. At this time, would counsel for the appellants please reintroduce himself on the record? He has three minutes. John Rizzio-Hamilton of Bernstein, Litowitz, Berger, and Grossman for the lead plaintiff appellant. I'd like to begin where my colleague left off. The theory of the rollover cessation having a material negative impact by itself was always part of this case. It is pled, for instance, at paragraphs 191, 308, and 219 to 220 of the complaint. Further, with respect to the knowledge of the rollovers, the theory in the case has never been that CVS had to have the QTAM complaint unsealed and in hand to have knowledge of the rollovers. Rather, the complaint alleges three principal sources of CVS's knowledge of the rollover practice, separate and apart from the existence of the QTAM. One is that boards of pharmacy across the country had initiated their own investigations into the matter. That's paragraph 198. Two is that there were multiple internal and third-party audits of the issue from 2012 through January 2018. That's paragraphs 198 through 208. And three, long-term care segment employees reported the practices to management in 2015 and 2016 at least, and that's paragraphs 202 to 204 as well as 208. Those allegations are more than sufficient to establish the issuer's knowledge separate and apart from the QTAM case. I think one of the arguments that I'm hearing is that the rollover practice, although it may have been technically improper, correcting it didn't involve a loss of business. They would just change the manner in which one bridged the lapse or run out of one prescription to the continuation of that through a second prescription for the same medication. So I don't think that really holds water for a couple of reasons. First, it assumes what might occur in the absence of a prescription, and there's really no basis on a Rule 8 pleading to make that assumption against the plaintiffs. Second, at a bare minimum, it would be an uncertainty as to what happens to the business in the absence of a prescription. And Item 303 requires disclosure of uncertainties as well as trends. So for all those reasons, the speculation about what might happen to the business in the absence of the prescription doesn't carry the day to dismiss this claim as a matter of law at the pleading stage under a Rule 8 standard. And finally, you know, I know that this happened well after we filed the complaint, but the impact on the business of the practices in the jury verdict and the judgment tells you that there's a lot of risk there that's in addition to the cessation of the practices, both with respect to damages and treble damages and sanctions. So you have a multilayered impact here that begins with the cessation and carries all the way through the sanctions issue that collectively needed to be disclosed under Item 303, although the cessation is analytically distinct. There was a contention by my colleague that our timeline is insufficiently pled. May I complete my thought? That's not so. Unlike the plaintiffs in the firefighters' case, we actually included a timeline. That's at pages 175 to 182 of the joint appendix, and it's summarized at pages 16 to 18 of our reply brief. Unless the court has any further questions for me, I see that my time is unfortunately expiring. Thank you. Thank you very much. Thank you, counsel. That concludes argument in this case.